IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                    CRIMINAL ACTION NO. 2:14-cr-00088

WHITNEY REANNE KENT,

    Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending are Defendant Whitney Kent's motion in limine [ECF 24], three motions to suppress [ECF 25, 26, and 27], and motion reserving the right to file additional motions [ECF 28]. On January 6, 2015, the Court held a pretrial motions hearing. For reasons more fully stated on the record during that hearing, Defendant's motion reserving the right to file additional motions [ECF 28] was **GRANTED**, and Defendant's motion in limine [ECF 24] was **DENIED AS MOOT**. For the reasons that follow, the Court **DENIES** Defendant's motions to suppress [ECF 25, 26, and 27].

I.    BACKGROUND

Inspector Joshua D. Mehall, an inspector with the United States Postal Inspection Service, testified at the pre-trial motions hearing. Mehall testified that he has worked as a postal inspector since 2007. On December 5, 2012, he was conducting a drug interdiction at the Express Mail room of the post office in Charleston, West Virginia, where he observed packages coming into the facility and being sorted. He was accompanied by Detective Justin Hackney, an officer with the Charleston Police Department.

Inspector Mehall testified that he was looking at packages for specific characteristics that would make him want to investigate them further for the potential presence of illegal drugs. According to Mehall, based on his training and experience, most of the Express Mail packages that he saw were business-to-business mail and did not contain handwritten labels. If an Express Mail package is sent by an individual to another individual and contains a handwritten label, that is exceptional and raises a red flag. Other red flags include a sending address from one of six to eight known source states for drugs arriving in West Virginia, excessive amounts of tape, or a sender or receiver name not associated with the address written on the label. The size of a package may also be relevant, as some envelopes clearly could not contain anything other than paper.

While conducting the investigation, Mehall testified that he observed an Express Mail Flat Rate envelope with a handwritten label. Upon seeing the handwritten label, Mehall picked up the package and ascertained from the label that the package was being sent individual-to-individual. Mehall also observed that the size of the envelope was such that it could have contained more than just paper and that the package was sent from New Jersey, a known drug source state for West Virginia. Mehall testified that at that point he read the addresses out loud, and Detective Hackney told him that the name of the person to whom the package was to be delivered, that of Defendant Whitney Kent, had come up in other drug-related investigations. Mehall further testified that name of the sender written on the label was "Glendina Mason." Mehall queried Accurint, a database that draws on publicly available information, and found that the sending address written on the label was not associated with "Glendina Mason."

Based on this information, Mehall pulled the package aside and requested a dog sniff of the package. A dog sniff was arranged within twenty minutes. The dog alerted to the box. Mehall obtained a warrant to search the package and found oxycodone pills inside.

The next morning, Mehall took the package down to the post office in London, West Virginia. He gave the postal workers there instructions on how to make a controlled delivery of the package. A postal worker delivered a form to Defendant's mailbox indicating that delivery had been attempted and indicating a number Defendant could call for re-delivery from Charleston. The number given was Mehall's cell phone number.

On December 7, 2012, Defendant called Mehall, who represented that he was with the post office.[1] Defendant stated that she worked in Charleston, and Mehall told her she could pick up the package at the Charleston post office. Shortly after noon, Defendant came to the Charleston post office, signed for the package, and took custody of it.

On her way out of the post office, Defendant was approached by Inspector Mehall and Detective Hackney. Mehall and Hackney identified themselves. Mehall testified that at the time Mehall and Hackney approached Defendant, she was free to leave.[2] Mehall testified that Hackney asked Defendant, "Whitney, what are you up to?" Defendant giggled. Mehall testified that Hackney then told Defendant "let's go talk about what's in your package," and the three of them went into the post office's inspection office.[3] Mehall and Hackney sat down with

---

[1] Inspector Mehall testified that Defendant called him on December 6, 2012. However, the Government's response to Defendant's motions to suppress represents that Mehall received the phone call on December 7, 2012, as does Mehall's "memo to file" about the encounter, admitted as Exhibit 14 at the pretrial motions hearing, and dated December 10, 2012.

[2] Mehall clarified that he would have not have let Defendant leave with the package and would have detained her if she had insisted on not relinquishing the package, but Defendant was otherwise free to leave and would not have been detained.

[3] Inspector Mehall's "memo to file" states that "Kent agreed to speak with the investigators in the Inspection Service office."

Defendant and asked her if she would tell them what was in her package. She said there were oxycodone pills inside. Mehall Testified that Hackney then asked Defendant, "What are you doing with that?" Defendant replied that they were for her boyfriend. At this point, Detective Hackney read Defendant her Miranda rights, and Defendant asked to speak to her lawyer. Neither investigator asker her any further questions. She was subsequently arrested.

Defendant was later charged with knowingly and intentionally possessing with intent to distribute a quantity of oxycodone, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1).

## II.   DISCUSSION

Defendant moves to suppress the evidence seized from the Express Mail envelope on the basis of the Fourth Amendment and the statements she made to Detective Hackney and Inspector Mehall on December 6, 2012, on the basis of the Fifth Amendment.

*A.  Whether Detention of Package was Supported by Reasonable Suspicion*

Defendant argues that the removal of the Express Mail envelope from the ordinary progress of the mails constituted an unreasonable seizure in violation of the Fourth Amendment, because at the point when he removed it Inspector Mehall lacked reasonable suspicion that the box contained contraband.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. In *United States v. Van Leeuwen*, 397 U.S. 249 (1970), the United States Supreme Court held that the temporary detention of packages for purposes of investigation is not an "unreasonable seizure" in violation of the Fourth Amendment, provided that (1) law enforcement authorities have a reasonable suspicion of criminal activity; and (2) the packages are not detained

for an unreasonable length of time. *See also United States v. Place*, 462 U.S. 696, 702 (1983) (applying doctrine of *Terry v. Ohio*, 392 U.S. 1 (1968), to detention of personal property, and holding that detention of luggage on less than probable cause, in order to pursue a limited course of investigation, does not violate defendant's Fourth Amendment rights where there is "reasonable articulable suspicion" that luggage contains contraband or evidence of a crime). Defendant does not argue that her package was detained for an unreasonable length of time. Rather, Defendant argues that reasonable suspicion of criminal activity was lacking when Inspector Mehall pulled Defendant's package aside from the course of the mails so that he could arrange a dog sniff.

      Before removing Defendant's package from the mail stream for a dog sniff, Mehall observed that it was an Express Mail package, that it contained a handwritten label, that it was sent by individual to an individual, that it originated in a drug source state, that the name on the return address was not associated with that address, and that its size was not inconsistent with the presence of drugs. Mehall testified that individual-to-individual packages with handwritten labels make up only an exceptionally small portion of Express Mail Packages, while packages that are found to contain narcotics typically fit this description. While much innocent mail may also meet this description, Mehall further testified that if a package, in addition to meeting this description, is also sent from a known drug source state and has a return address that is not associated with its purported sender, it is often indicative of the presence of illegal drugs in the package. Mehall testified that these observations were based on what he has learned from formal training as well as on what he has observed in his now seven years' worth of experience as a postal inspector. In addition to the package meeting these several profiling factors, Mehall also testified that Hackney told him that name of the recipient on the label had come up in the context

of criminal investigations related to illegal drugs. "A combination of seemingly independent innocent factors may create a reasonable suspicion justifying detention for a dog sniff if the factors substantially reflect elements of a suspicious profile." *United States v. Scarborough*, 128 F.3d 1373 (10th Cir. 1997). In what has become a large line of cases, a number of federal circuits have found that a combination of similar factors created reasonable suspicion to seize a package.[4] The Court has no problem finding reasonable suspicion based solely on the several

---

[4] *See United States v. Golson*, 743 F.3d 44 (3d Cir. 2014) (fictitious and non-deliverable return address, sent from Arizona to Pennsylvania, and addressee not a person known to receive mail at the address listed); *United States v. Huerta*, 655 F.3d 806 (8th Cir. 2011) (Express Mail package, handwritten label, sent from drug source state, name of sender unrelated to return address, telephone number listed for sender disconnected day after package was mailed, number in return address was scratched out, mailing zip code different than zip code on return address, destination address a hotel, and heavily taped); *United States v. Colon*, 386 Fed. Appx. 229 (3d Cir. 2010) (Express Mail package, sent from drug source location, mailed from a post office outside of the zip code on the return address, no one by the sender's name lived at the return address, and heavily taped); *United States v. Lozano*, 623 F.3d 1055 (9th Cir. 2010) (handwritten label, sent from California, fictitious sender and addressee, incomplete return address, heavily tapes, shipped with delivery confirmation service, and defendant asked postal employee whether mail could be searched for drugs); *United States v. Alexander*, 540 F.3d 494 (6th Cir. 2008) (handwritten label, sent from Las Vegas and to Shaker Heights, Ohio, fictitious return address, signature waived with an "X" mark, and package seemed "dense"); *United States v. Lakoskey*, 462 F.3d 965 (8th Cir. 2006) (Express Mail package, handwritten label, sent from drug source state, return address contained fictitious name, and inspector received tip to watch for drug shipments to recipient); *United States v. Morones*, 355 F.3d 1108 (8th Cir. 2004) (shipped "priority overnight," handwritten labels, paid for in cash, no phone numbers listed, and shipper and recipient had same last name); *United States v. Walker*, 324 F.3d 1032 (8th Cir. 2003) (Express Mail package, handwritten labels, sent from drug source city, paid for in cash, and package delivered to airport by individual driving rental vehicle rented by individual living 60 miles from airmail facility); *United States v. Terriques*, 319 F.3d 1051 (8th Cir. 2003) (heavily taped, fictitious return address, return address located in high crime area, label listed an individual's name but address was in a business area, and mailed at a postal facility far from the return address); *United States v. Gomez*, 312 F.3d 920 (8th Cir. 2002) (Express Mail package, sent from drug-source city and state, heavily taped, weighed 12 pounds, paid for in cash, mailed on Friday for delivery on Saturday, and sender and addressee had same last name); *United States v. Higuera*, 50 Fed. Appx. 790 (8th Cir. 2002) (Express Mail package, handwritten label, mailed late in day, paid for in cash seams were taped, weighed more than the typical Express Mail package, sent from Los Angeles, California); *United States v. Evans*, 282 F.3d 451 (7th Cir. 2002) (Express Mail package, handwritten label, sent from drug source state, address on package had received parcels with fictitious return address on previous occasions, and postal inspector had 11 years' worth of experience inspecting packages containing contraband); *United States v. Hernandez*, 313 F.3d 1206 (9th Cir. 2002) (Express Mail package, handwritten label, sent from drug source state, name on return address could not be confirmed, and almost all seams on package were sealed); *United States v. Gill*, 280 F.2d 923 (9th Cir. 2002) (package was excessively wrapped, furtive movements by defendant when he mailed package, sender and addressee named on package were aliases, and defendant resided at different address than return address); *United States v. Dennis*, 115 F.3d 524 (7th Cir. 1997) (Express Mail package, individual-to-individual, sent from drug source city, heavily taped, mailed from zip code different from the one listed in return address); *United States v. Scarborough*, 128 F.3d 1373 (10th Cir. 1997) (Express Mail package, handwritten label,

6

profiling factors met by Defendant's package. Hackney's statement that Defendant's name had come up in the context of criminal investigations related to illegal drugs provides additional support, but the Court would find reasonable suspicion without it.

Accordingly, the Court **FINDS** that the temporary detention of the Express Mail envelope did not constitute an unreasonable seizure in violation of the Fourth Amendment.

### B. Whether Warrant was Supported by Probable Cause

Defendant's second argument is that the search of the Express Mail envelope and its contents constituted an unreasonable search and seizure in violation of the Fourth Amendment,

---

individual-to-individual, sent from drug source state, no return zip code, misspelled return address street, correction in city portion of return address, and nonexistent return address street number); *United States v. Glover*, 104 F.3d 1570 (10th Cir. 1997) (Express Mail package, defendant's daughter potentially involved in drug trafficking, package and most prior packages smelled like coffee, and return addresses on prior packages used fictitious names or addresses); *United States v. Underwood*, 97 F.3d 1453 (6th Cir. 1996) (Express Mail package, handwritten label, individual-to-individual, sent from known drug source city, voluminous package, and several other factors); *United States v. Allen*, 990 F.2d 667 (1st Cir. 1993) (Express Mail package, individual recipient, sender's address was fictitious addressee received three packages in five months, inspector knew that addressee had received suspicious mailings in the past, labels were suspicious because return addresses differed but handwriting appeared the same, and one of the senders had same name as someone who previously mailed express mail package containing psilocybin); *United States v. Lux*, 905 F.2d 1379 (10th Cir. 1990) (package met three out of seven characteristics of Postal Service's drug package profile); *United States v. Johnson*, 25 F. Supp. 3d 1034 (W.D. Mich. 2014) (Express Mail package, handwritten label, sent from drug source city, weighed more than eight ounces); *United States v. Bailey*, 193 F. Supp. 2d 1044 (S.D. Ohio 2002) (Express Mail package, individual-to-individual, sent from Southern California, incomplete return address, and bulky); *United States v. Claps*, 818 F. Supp. 1417 (D. Colo. 1993) (nonexistent return address); *United States v. Cantrall*, 762 F. Supp. 875 (D. Kansas 1991) (Express Mail package, handwritten label, sent from drug source area, return addressee and return address did not match, destination of package was residential address, and addressee had received several other packages with return addresses that were nonexistent); *United States v. Sklar*, 721 F. Supp. 7 (D. Mass. 1989) (defendant received several packages within a short time from a known drug source area and packages apparently originated from same person but originated from several different addresses yet all but one of return addresses was fraudulent). *Accord United States v. Forrest*, 182 F.3d 910 (4th Cir. 1999) ("We also find that Government investigators had reasonable suspicion to seize the packages Forrest left at a private mail service."). *But see United States v. Demoss*, 279 F.3d 632 (8th Cir. 2002) (inadequate evidence of reasonable suspicion where air bill was handwritten and package was sent from a drug source state); *United States v. Vasquez*, 213 F.3d 425 (8th Cir. 2000) (inadequate evidence of reasonable suspicion where package was incorrectly addressed even though sender and recipient had same last name, air bill was handwritten, marked "priority overnight," and contained no account number, and package was sent from California); *United States v. Johnson*, 171 F.3d 601 (8th Cir. 1999) (inadequate evidence of reasonable suspicion where labels were handwritten, package was mailed from one individual to another individual at the same address, package was sent from a drug source state, and return address zip code was different than accepting zip code).

because, even though the package was searched pursuant to a warrant, the warrant was not supported by probable cause because material information was deliberately or recklessly misstated or omitted from the warrant affidavit submitted to the issuing magistrate.

In *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978), the Supreme Court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." If at the hearing the defendant establishes the allegation of intentional falsehood or disregard for the truth by a preponderance of the evidence, and if, "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, [then] the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Id.* at 156. To attack an affidavit based on omitted information, the defendant must show that the omission is the product of a deliberate falsehood or of a reckless disregard for the truth, and that inclusion of the omitted information in the affidavit would defeat probable cause. *United States v. Colkley*, 899 F.2d 297, 301–02 (4th Cir. 1990)

The warrant affidavit in this case was based not only on the factors mentioned *supra*, in the reasonable suspicion analysis, but also on the fact that a drug dog alerted on the package when it was placed in a line-up with other packages. "[I]t is well settled that a 'positive alert' from a drug detection dog, in and of itself, provides probable cause . . . ." *United States v. Branch*, 537 F.3d 328, 340 (4th Cir. 2008). *See also United States v. Robinson*, 707 F.2d 811, 815 (4th Cir. 1983) ("The detection of narcotics by a trained dog is generally sufficient to

establish probable cause."). However, evidence must support the dog's reliability as an indicator of drugs. *See Florida v. Harris*, 133 S. Ct. 1050, 1058 (2013). When inquiring into the reliability of a drug dog, "[t]he question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Id.*

In the warrant affidavit itself, the only evidence relevant to the dog's reliability is that the dog was "a trained narcotic detection dog" with "over three years' experience with narcotics investigations including drug parcels." From the dog's certification and experience, it may reasonably have been inferred that the dog was reliable. On the other hand, there is no evidence in the affidavit tending to cast doubt on the dog's reliability. Thus, the evidence in the affidavit supports a finding of probable cause by the magistrate.

Defendant makes two arguments in support of her request for a *Franks* hearing. First, Defendant asserts that Inspector Mehall's statement in the warrant affidavit that Peanut, the dog that alerted on Defendant's package, was a "trained narcotic detection dog" with "over three years' experience with narcotics investigations including drug parcels" was made with reckless disregard for the truth, as the drug dog was not trained to detect the oxycodone pills found in Defendant's package. Second, Defendant asserts that the drug dog's handler, Detective Hackney, lacked credibility, that this lack of credibility would undermine the reliability of any purported dog alert sufficient to defeat probable cause, and that Mehall was reckless in omitting information about Hackney's credibility.

Defendant's first argument is unpersuasive. Defendant points to the fact that Peanut has been trained to detect marijuana, cocaine, methamphetamine, and heroin—but not oxycodone

pills of the sort that were found in Defendant's package. At the pretrial motions hearing, Defendant called Dr. Rebecca Linger, an associate professor of medicinal chemistry at the University of Charleston School of Pharmacy, who testified that, although both heroin and oxycodone are opiates, the molecules contained in oxycodone are different than those contained in heroin. The parties also stipulated that a dog's nose can distinguish between substances on a molecular level.[5] Finally, a board member and secretary for the West Virginia Police Canine Association testified that his organization previously had a separate certification for oxycodone, and that if a dog is certified to detect heroin it does not necessarily mean that a dog is certified to detect all opiates.

However, none of these facts are ultimately relevant to the showing Defendant must make under *Franks*. Defendant's *Franks* challenge suffers from hindsight bias. At the time when the dog sniff was arranged, Mehall and Detective Hackney were searching for illegal drugs, not for oxycodone pills specifically. In general, the fact that a dog had not been trained to detect the drug that was ultimately found in the package is not relevant to the determination of whether probable cause to search the package existed at the time the dog alerted to the presence of drugs. *See United States v. Robinson*, 707 F.2d 811, 815 (4th Cir. 1983) (where dog was trained to alert to packages which had been in the possession of individuals who had handled marijuana, cocaine, or heroin, dog's alert "was sufficient to establish probable cause for a search for controlled substances" and "the fact that a different controlled substance was actually discovered does not vitiate the legality of the search"). Here, although the fact that Peanut had not been trained in detecting oxycodone pills might arguably have been relevant if the warrant affidavit had represented that the search warrant was being sought to search for oxycodone pills,

---

[5] The parties did not stipulate, nor was there evidence presented, that a dog can distinguish between heroin and oxycodone.

the warrant affidavit asserts that there was probable cause to believe that Defendant's package contained a controlled substance.[6]  Moreover, Mehall testified that Detective Hackney held himself out as a certified drug dog handler, and, absent any evidence to the contrary, Mehall should have been able to rely on Hackney's good faith assertions as to Peanut's qualifications.

This dovetails with Defendant's second argument—that Mehall recklessly omitted information about Hackney's credibility as a dog handler.  Defendant points to the fact that in January of 2013, Detective Hackney was caught fabricating a dog sniff report.  Inspector Mehall also testified that he does not independently ascertain whether a drug dog has alerted to a package; he depends on the dog's handler to tell him whether or not the dog has alerted.  Thus, Defendant argues, any claim by Hackney that Peanut alerted to the package is not credible.

The problem with this argument is that Hackney's false report was not made until a month after the December 5, 2012 dog alert at issue here.  At the time he submitted his warrant affidavit, Inspector Mehall had no way of knowing that Hackney would later submit a false report.  There is no other evidence on record that should have put Mehall on notice that Hackney may have credibility issues.  Thus, Mehall could have been neither deliberate nor reckless in omitting information regarding a circumstance that had not yet occurred when he filled out the warrant affidavit.

---

[6] If anything, the fact that Peanut was not trained on oxycodone pills and that dogs can distinguish on a molecular level between oxycodone pills and other opiates tends to show that Peanut was likely to fail to alert in the presence of oxycodone pills, that is, to provide a false negative, rather than that Peanut was likely to alert falsely.  On the other hand, at the pretrial motions hearing, West Virginia Police Canine Association President William Reynolds testified that his narcotics detection dog "routinely" finds opiate pills, even though not trained specifically to detect them.

### C. Whether Defendant's Fifth Amendment Miranda Rights Were Violated

Defendant finally argues that the Fifth Amendment was violated, as no *Miranda* warning was given to Defendant before she told Inspector Mehall and Detective Hackney that the package she received contained oxycodone pills and that the pills were for her boyfriend.

*Miranda* warnings are required when a suspect in custody is subjected to interrogation. *Miranda v. Arizona*, 384 U.S. 436 (1966). The test for determining whether an individual is "in custody" for *Miranda* purposes is whether, under the totality of the circumstances, the "suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (internal quotation marks omitted). The key question is whether, viewed objectively, "a reasonable man in the suspect's position would have understood his position" as being "in custody." *Id.* at 422. Facts relevant to this determination include, but are not limited to, "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant." *United States v. Day*, 591 F.3d 679, 696 (4th Cir. 2010).

Mehall and Hackney approached Defendant outside of the Charleston post office in the early afternoon. The Government's response to the motions to suppress asserts that "Hackney had developed an amicable rapport with [Defendant] from speaking with her in other investigations." This statement finds support in Mehall's testimony that Hackney recognized Defendant's names from other criminal investigations, that outside the post office Hackney asked the Defendant, "Whitney, what are you up to?", and that Defendant giggled in reply. This exchange suggests that Defendant was approached in a friendly, familiar manner. The interview

took place in a room inside the post office, a short distance from where the officers made contact with Defendant. There is no indication that Mehall or Hackney displayed a weapon. Defendant was not handcuffed. Thus, it appears that the interview took place in a non-threatening atmosphere, without Defendant being physically detained or told that she was not free to leave. There is no indication that the questioning took place in a context where Defendant's freedom to depart was restricted in any way. "Any interview of one suspected of a crime will have coercive aspects to it." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). However, it does not appear that Defendant had an objective basis to perceive that her freedom of action was curtailed to a degree associated with formal arrest.

Accordingly, the Court **FINDS** that *Miranda* does not prohibit the introduction of Defendant's statements.

### III. CONCLUSION

For these reasons, Defendant's motions to suppress [ECF 25, 26, and 27] are **DENIED**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, and the United States Probation Office.

ENTER: January 30, 2015

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE